IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TONYA L. KELLER,                   :
                                   :
            Plaintiff              :    CIVIL No. 3:12-CV-01502
                                   :
        vs.                        :    Hon. John E. Jones III
                                   :
CAROLYN W. COLVIN, ACTING          :
COMMISSIONER OF SOCIAL             :
SECURITY,                          :
                                   :
            Defendant              :

**MEMORANDUM**

February 20, 2014

**BACKGROUND**

        The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Tonya L. Keller's claim for social security disability insurance benefits.

        Keller protectively filed[1] her application for disability insurance benefits on May 18, 2009. Tr. 10, 24, 115-118, 128 and 141.[2] The application was initially denied by the Bureau of

---

[1]Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

[2]References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of the Answer on October 11, 2012.

Disability Determination[3] on September 3, 2009. Tr. 10, 52-53 and 54-58.  On November 3, 2009, Keller requested a hearing before an administrative law judge. Tr. 10 and 59-60.  After about 11 months had passed, a hearing was held on October 6, 2010, before an administrative law judge. Tr. 10 and 22-51.  Keller was represented by counsel at the hearing.  Id.  On October 22, 2010, the administrative law judge issued a decision denying Keller's application. Tr. 10-17.  As will be explained in more detail *infra* the administrative law judge found that Keller had the capacity to perform a limited range of light work[4] and identified two

---

[3]The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration. Tr. 55.

[4]The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the

positions, an injection molding machine tender and a toll collector, which Keller could perform. Tr. 13, 17 and 48. On November 22, 2010, Keller filed a request for review with the Appeals Council and after over 17 months had elapsed the Appeals Council on June 29, 2012, concluded that there was no basis upon which to grant Keller's request for review. Tr. 1-6.

Keller then filed a complaint in this court on August 2, 2012. Supporting and opposing briefs were submitted and the appeal[5] became ripe for disposition on February 13, 2013, when Keller filed a reply brief.

Disability insurance benefits are paid to an individual if

---

ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work*. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work*. Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. § 404.1567.

[5]Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

3

that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Keller met the insured status requirements of the Social Security Act through March 31, 2007.  Tr. 10, 12 and 24.  In order to establish entitlement to disability insurance benefits Keller was required to establish that she suffered from a disability on or before that date. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Keller, who was born on November 11, 1964,[6] graduated from high school in 1982 and can read, write, speak and understand the English language and perform basic mathematical functions, including counting change, handling a savings account and using a checkbook and money orders.  Tr. 27, 30, 115, 144, 151 and 160. During her elementary and secondary schooling, Keller attended regular education classes. Tr. 29 and 151. After graduating from high school, Keller successfully completed a one-year nursing program and became a licensed practical nurse in 1986. Tr. 30 and

---

[6]At the time of the administrative hearing held in this case Keller was 45 years of age and considered a "younger individual" whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. § 404.1563(c).  The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

151.

Keller's work history covers 22 years and at least 6 different employers. Tr. 129-136, 170 and 196. The records of the Social Security Administration reveal that Keller had earnings in the years 1980 through 1989 and 1991 through 2002. 129. Keller's annual earnings range from a low of $253.75 in 1983 to a high of $32,414.29 in 2000. Id. Keller's total earnings during those 22 years were $269,205.86. Id.

A vocational expert described Keller's past relevant employment history[7] as follows: (1) a licensed practical nurse, skilled, medium work; and (2) a warehouse worker, unskilled, medium work as customarily performed and light work as actually performed by Keller. Tr. 16, 44-45 and 194.

Keller initially claimed that she became disabled on November 23, 2001, because of the pain associated with a back injury. Tr. 115 and 145. The pain was noted to be in the low back and radiated to the lower extremities. Tr. 183. The impetus for the pain was a work-related incident in April, 2001, where she was lifting a patient and she felt a popping sensation in her back. Tr. 294 and 363. A claim by Keller under the Pennsylvania Workers'

---

[7]Past relevant employment in the present case means work performed by Keller during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565. To be considered past relevant work, the work must also amount to substantial gainful activity. Pursuant to Federal Regulations a person's earnings have to rise to a certain level to be considered substantial gainful activity.

Compensation Act was settled in December, 2009, in favor of Keller in the amount of $120,000. Tr. 28 and 137-140.

At the administrative hearing, Keller amended the alleged disability onset date to February 1, 2005. Tr. 24. The reason given for the amendment was that a treating neurosurgeon, Arnold G. Salotto, M.D., indicated that Keller on February 1, 2005, was no longer capable of sustaining full time work activity. Tr. 27. The administrative law judge accepted the amendment of the alleged onset date and noted that the hearing would focus on the period February 1, 2005 through March 31, 2007, the date last insured.[8] Tr. 24 and 26.

The disabling impairments alleged at the administrative hearing by Keller were "lumbar degenerative disc disease status post total disc replacement at L4/L5"[9] and chronic low back pain

---

[8]If an individual establishes disability on or before the date last insured, the ALJ is required to determine whether that disability continued through the date of the administrative hearing.  This statement by the ALJ that the hearing would be limited to the period of time from the amended disability onset date to the date last insured is troublesome because it presupposes that Keller would fail to prove that she was disabled on or before the date last insured.

[9]The spine (vertebral column) from the head to the tailbone is divided into five regions: the cervical (consisting of 7 vertebrae, C1-C7 in descending order), the thoracic (12 vertebrae, T1-T12 in descending order), the lumbar (5 vertebrae, L1-L5 in descending order), the sacrum (5 fused vertebrae, S1-S5 in descending order) and the coccyx (4 fused vertebrae). Other than the first two vertebrae of the cervical spine (C1 and C2), the vertebrae of the cervical, thoracic and lumbar regions are similarly shaped.
A vertebra consists of several elements, including  the vertebral body (which is the anterior portion of the vertebra),

6

with radiculopathy.[10] Tr. 24-25.   Keller testified that prior to

---

pedicles, laminae and the transverse processes.  The vertebral body
is the largest part of the vertebra and is somewhat oval shaped.
The endplates are the top and bottom portions of a vertebral body
that come in direct contact with the intervertebral discs.

The intervertebral discs (made of cartilage) are the cushions
(shock absorbers) between the bony vertebral bodies that make up
the spinal column. Each disc is made of a tough outer layer and an
inner core composed of a gelatin-like substance. The outer layer of
an intervertebral disc is called the annulus fibrosus and the inner
core the nucleus pulposus. Jill PG Urban and Sally Roberts,
Degeneration of the intervertebral disc, PublicMedCentral,http:
//www.ncbi.nlm.nih.gov/pmc/articles/PMC165040/(Last accessed
February 18, 2014); see also Herniated Intervertebral Disc Disease,
Columbia University Medical Center, Department of Neurology,
http://www.columbianeurosurgery.org/conditions/herniated-interverte
bral-disc-disease/ (Last accessed February 18, 2014).

Degenerative disc disease is the wear and tear and breakdown
of the intervertebral discs as a person grows older.  It is a
process that can result from the dehydration of the discs as well
as an injury to the spine. The breakdown of the intervertebral
discs can result in discs bulging, protruding or herniating as well
as the inner gelatin-like core of the disc extruding outside the
annulus fibrosus. These conditions sometimes obstruct the openings
(foramen) along the spine through which nerve roots exit. This
condition is known as neural foraminal stenosis. They can also
result in a narrowing of the spinal canal or spinal stenosis. Such
bulges, protrusions and herniations if they contact nerve tissue
can cause pain.

Degenerative joint disease (or osteoarthritis) is a breakdown
of the cartilage between joints.  In the spine there are facet
joints which are in the back of the spine and act like hinges.
There are two superior (top) and two inferior (bottom) portions to
each facet joint called the superior and inferior articular
processes. These joints are covered with cartilage and the wear and
tear of these joint is known as facet arthropathy (arthritis). This
wear and tear of the facet joints result in loss of cartilage and
can cause pain.

[10]Radiculopathy is a condition where one or more nerves or
nerve roots are affected and do not work properly. The nerve roots
are branches of the spinal cord. They carry signals to the rest of
the body at each level along the spine. The nerve roots exit
through holes (foramen) in the bone of spine on the left and the
right. Radiculopathy can be the result of a disc herniation or an
injury causing foraminal impingement of an exiting nerve (the

the date last insured of March 31, 2007, she had "mid-back pain radiating down [her] right buttock to the front of [her] leg the whole way down to [her] foot, numbness in [her] feet" and radiation of pain to the left buttock but "not as much" as the right. Tr. 34. Keller further stated that she stumbles on her feet because of lack sensation in them. Id. Keller reported falling because of lack of feeling in her lower extremities. Tr. 39. During the administration hearing which lasted 38 minutes Keller had to change from a sitting to a standing position on several occasions purportedly to relieve her pain. Tr. 30 and 49.

In a "Function Report - Adult" Keller indicated that she engages in some activities of daily living, including cooking simple meals but with the assistance of others. Tr. 157-164.  She further indicated that she has difficulty engaging in personal care, including dressing and bathing. Tr. 158.  When asked to check items which are affected by her illnesses or conditions Keller checked the following: lifting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, memory, completing tasks, concentration, following instructions and getting along with others. Tr. 162.  Keller also stated in documents and testified at the hearing that because of her pain for a large portion of each day she is laying on her side with a pillow between her legs and

---

narrowing of the channel through which a nerve root passes). See, generally, Radiculopathy, MedicineNet.com, http://www.medicinenet.com/radiculopathy/article.htm (Last accessed February 18, 2014).

that she has side-effects, including drowsiness, confusion and problems with concentration caused by the narcotic pain medications which she takes. Tr. 37-39 and 183.

For the reasons set forth below we will remand the case to the Commissioner for further proceedings.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d

1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th

Cir. 2001);  <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11

(11th Cir. 1990).

Substantial evidence "does not mean a large or
considerable amount of evidence, but 'rather such relevant evidence
as a reasonable mind might accept as adequate to support a
conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)(quoting
<u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938));
<u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d
Cir. 2008);  <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999).
Substantial evidence has been described as more than a mere
scintilla of evidence but less than a preponderance. <u>Brown</u>, 845
F.2d at 1213.   In an adequately developed factual record
substantial evidence may be "something less than the weight of the
evidence, and the possibility of drawing two inconsistent
conclusions from the evidence does not prevent an administrative
agency's finding from being supported by substantial evidence."
<u>Consolo v. Federal Maritime Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all
the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and
"must take into account whatever in the record fairly detracts from
its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488
(1971). A single piece of evidence is not substantial evidence if
the Commissioner ignores countervailing evidence or fails to

resolve a conflict created by the evidence.  <u>Mason</u>, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[11] (2) has an impairment that is severe or a combination of impairments that is severe,[12] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed

---

[11]If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

[12]The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523 and 404.1545(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

impairment,[13] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. <u>Id</u>.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. <u>Id</u>.[14]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. <u>Id</u>; 20 C.F.R. § 404.1545; <u>Hartranft</u>, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**Medical Records**

Before we address the administrative law judge's decision and the arguments of counsel, we will review some of Keller's

---

[13]If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

[14]If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

medical records.

Keller's primary care physician from early 2001 through the date last insured was William A. Kramer, M.D., of Franklin Family Practice located in Chambersburg, Pennsylvania.  Tr. 237-238, 262 and 621.

On May 18, 2001, at the request of Charles C. Morris, M.D., Keller had an MRI of the lumbar spine performed at the Chambersburg Hospital. Tr. 237-238 and 291.  A copy of the report of the MRI was provided to Dr. Kramer.[15] Id.  The clinical reason for requesting the MRI was that Keller complained of "lower back pain radiating down the right leg." Tr. 237.  The MRI revealed "[m]inimal generalized bulging of the L4-L5 annulus [] without focal herniated nucleus pulposus" but "associated with mild degenerative disc change," a "slight focal disc protrusion [at the L3-L4 level] extending into the right neural foramen and compressing the right nerve root slightly," and "[m]ild to moderate facet arthropathy [] at [the] L3-L4, L4-L5 and L5-S1 levels[] with borderline central spinal stenosis at L3-L4." Id.

Dr. Kramer's treatment notes are handwritten and only partially legible.  The first notes that we encounter are from April through November, 2001, which reveal that Keller was complaining of back pain and that Dr. Kramer prescribed narcotic

---

[15]The record does not reveal the professional relationship between Dr. Kramer and Dr. Morris. We suspect that they may have been associated in the same medical practice.

pain medications, including Percocet and Darvocet, and the muscle relaxant Skelaxin. Tr. 621-622.  A physical examination performed in November by Dr. Kramer revealed spasms in the right paraspinal muscles and decreased range of motion in all planes as well as a positive straight leg raising test at 60 degrees.[16] Id.  Dr. Kramer indicated that Keller had a follow-up appointment scheduled with Richard J. Boal, M.D., of the Orthopedic Institute of Pennsylvania on December 4, 2001. Id.

Dr. Boal at that follow-up appointment performed a physical examination which did not reveal any adverse findings other than in Keller's right leg she had a diminished knee reflex and sensation loss in the thigh and down the anterior medial aspect of the tibia and slight muscle weakness in the right foot.  Tr. 215. Dr. Boal noted that Keller had good range of motion of the lumbar spine. Id.  After reviewing Keller's MRI of the lumbar spine, Dr.  Boal stated that it revealed "a bulging disc at [the] L3-4 [level] on the right which [was] consistent with her symptoms." Id.  Dr. Boal's diagnostic impression was that Keller suffered from a "[h]erniated disc, L3-4 on the right." Id.  Dr.

---

[16]The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc.  The patient, either lying or sitting with the knee straight, has his or her leg lifted.  The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated -discs-straight-leg-raise (Last accessed February 18, 2014).

Boal recommended a series of epidural steroid injections before Keller opted for surgery. Id.

On December 5, 2001, Keller received an epidural steroid injection at the L4-5 level of the lumbar spine which was administered by Timothy J. Sempowski, D.O., at the Chambersburg Hospital. Tr. 294-295. Prior to the injection, Dr. Sempowski performed a clinical interview and physical examination and reviewed the MRI of Keller's lumbar spine. Id. He also reviewed the report of an electromyography (EMG) which revealed that Keller suffered from chronic L4 radiculopathy on the right. Id.

On January 2, 2002, Keller had an appointment with Dr. Boal who after performing a clinical interview and physical examination informed Keller that it was his opinion that she suffered from a herniated disc at the L3-L4 level of the lumbar spine. Tr. 214. The physical examination findings reported by Dr. Boal, however, were essentially normal, including normal range of motion in the lumbar spine and a negative straight leg raising test. Id. Dr. Boal recommend that Keller have a repeat MRI of the lumbar spine and referred her to a pain management specialist, Malik M. Momin, M.D. Id. The MRI was performed on January 8, 2002, and revealed a "[s]mall disc bulge as well as a small broad based central disc herniation at L4-5" but which did not "cause any significant spinal stenosis or definite nerve root compression" and "[c]ompared to [her] previous MRI dated 5/18/2001, there [was] no

16

evidence of right foraminal disc herniation at L3-4." Tr. 274. Also, "[t]he findings at L4-5 [were] about the same as [the] previous MRI." Id.

Keller had an appointment with Dr. Momin on January 10, 2002, at which Dr. Momin administered an epidural steroid injection at the L4-L5 level of Keller's lumbar spine. Tr. 363-364 and 384-385. Prior to administering the epidural steroid injection, Dr. Momin performed a physical examination which revealed that Keller had "diffuse tenderness over the lumbosacral paravertebral muscles," a positive straight leg raising test on the right, and limited lumbar range of motion. Tr. 364. On February 5, 2002, Dr. Momin performed lumbar discography (a lumbar discogram) at the L3-L4, L4-L5 and L5-S1 levels of Keller's spine. Tr. 380-382. This procedure revealed pain at the L3-L4 and L4-L5 levels but no pain at the L5-S1 level.[17] Id.

Dr. Kramer's notes reveal that during December, 2001, and through January, 2003, he continued to treat Keller's low back pain with narcotic pain medications and muscle relaxants, including Oxycontin and Flexeril. Tr. 615-620. Also, during 2002 and through January 16, 2003, Keller had several appointments with Steven B. Wolf, M.D., at the Orthopedic Institute of Pennsylvania. Tr. 207-

---

[17]Discography is an invasive pain provocative procedure to confirm which discs are responsible for an individual's pain. Needles are inserted and pressurized fluid injected into the suspected discs and the pain response recorded. The procedure is fairly definitive and can be used to detect exaggerated symptoms.

212.  In June, 2002, Dr. Wolf noted that the MRI from January did

not  "look that bad as far as stenosis" but he ordered a repeat MRI

because Keller's condition had worsened since January. Tr. 210.

On June 23, 2002, Keller had the third MRI of the lumbar spine at

the Chambersburg Hospital which revealed a disc herniation at the

L4-L5 level on the left which did not appear to produce significant

neural foraminal compromise and a disc bulge at the L3-L4 level

which also did not appear to produce significant neural foraminal

compromise or stenosis. Tr. 276.

On January 16, 2003, after performing a clinical interview

and a physical examination of Keller, Dr. Wolf's diagnostic

impression was that Keller suffered from "[p]ersistent discogenic

pain in the lumbar spine" and stated that Keller "could be a

candidate for an artificial disc replacement[.]" Tr. 207. Dr. Wolf

further noted that Keller had "not been able to increase her

function enough to go back to work." Id.

Keller continued to receive treatment during 2003 and 2004

from several physicians, including Dr. Kramer.  Tr. 206, 361-362,

378-379, 409, 413-420, and 604-614.  Dr. Kramer continued to

prescribe narcotic pain medications, including Avinza (morphine).

Id.  The treatment during this period also included lumbar facet

joint injections on the right side at L3-4, L4-5 and L5-S1 levels

by Dr. Momin. Tr. 378-379.

In May and August, 2004, Keller had additional MRIs of the

18

lumbar spine performed at the Chambersburg Hospital. Tr. 278 and 280.  The MRI in May revealed "[l]eft lateral disc bulges at the L3-4 and L4-5 levels producing mild neural foraminal compromise bilaterally" and a "[r]ight lateral disc bulge or protrusion at the L2-3 level producing moderate neural foraminal compromise." Tr. 278. The MRI in August revealed a "[m]inimal right sided disc protrusion at L2-3 extending into the foramen" which appeared similar to the prior study of May, 2004, and a "[m]ild disc bulge at L4-5 eccentric to the left[.]" Tr. 280.

On February 7, 2005, Dr. Momin performed a second discography which revealed "an intense concordant back pain response on injection of both the L3-4 and L4-5 discs" and "[n]o pain was acknowledge on injection of the L5-S1 disc despite achieving maximum disc pressure of 124 PSI." Tr. 375.  After this discography Keller had an appointment with Arnold G. Salotto, M.D., regarding artificial disc replacement surgery. Tr. 410-411.  Dr. Salotto ordered a repeat MRI which was performed on February 18, 2005, and revealed a "[s]mall right lateral [herniated nucleus pulposus] at L2-3 extending into the neural foramen" and a "[b]road-based protrusion, eccentric to the left side at L4-5, flattening the anterior margin of the thecal sac."[18] Tr. 233.

---

[18]The thecal sac is an elongated tube that extends from the brain to the end of the spine in which the spinal cord and nerve roots run. It is a covering (membrane) that surrounds the spinal cord and contains cerebral spinal fluid. Herniated discs which impinge the thecal sac may or may not cause pain symptoms.

Keller had a follow-up visit with Dr. Salotto on February 28, 2005, at which Dr. Salotto reviewed the results of the MRI with Keller and discussed artificial disc replacement surgery. Tr. 408. The disc replacement surgery was performed on March 1, 2005, by Dr. Salotto and two other physicians. Tr. 406-407.

Post-operatively Keller did well but continued to receive narcotic pain medications, including Avinza, from Dr. Kramer. Tr. 453 and 601. Two months after the surgery Dr. Salotto reported that Keller's incision was well healed; she ambulated normally; and she had good strength in her extremities. Tr. 453. Keller told Dr. Salotto that her preoperative back pain had significantly improved although she had some residual soreness in the abdominal muscles. Id. From April through the end of 2005 and into January 2006, Keller continued to receive narcotic pain medications from Dr. Kramer. Tr. 591-596 and 599-600. X-rays of the lumbar spine in May, 2005, revealed "[s]table appearing post surgical changes in the lumbar spine." Tr. 452. In June, 2005, Keller told Dr. Salotto that she was pleased with the improvement. Tr. 459. In August of 2005, Keller commenced physical therapy and attended such therapy for 4 sessions. Tr. 461 and 488.

In January, 2006, Keller at an appointment with Dr. Salotto reported an exacerbation of back pain after performing physical therapy. Tr. 480. Keller indicated that the pain was in the lower back and radiated towards the buttocks. Id. She further

reported cramping in her thighs and that the symptoms had progressed over the past month or so. Id.  A physical examination performed by Dr. Salotto revealed mild diffuse tenderness in the lumbar spine and a decrease in pinprick sensation in the right leg and foot as compared to the left side. Id. Dr. Salotto recommended a repeat MRI of the lumbar spine. Id. The MRI was performed on January 10, 2006, and revealed "[m]ild right posterolateral and foraminal disc protrusion at L2-3[.]" Tr. 269.

During 2006 and through March 31, 2007, the date last insured, Keller continued to have appointments with Dr. Kramer who continued to prescribe narcotic pain medications for Keller's back pain. Tr. 559-560 and 583-590.  Also, on January 26, 2006, and February 12 and March 2, 2007, Keller was administered lumbar epidural steroid injections by Dr. Momin. Tr. 368-373.

On October 27, 2006, Keller had an MRI of the lumbar spine which revealed a "[s]mall right lateral disc protrusion at the L2-3 and L3-4 levels" which "produce mild, right-sided neural foraminal compromise[.]" Tr. 502.

Dr. Salotto examined Keller on May 26, 2006, and noted that Keller had limited flexion and extension of the lumbar spine associated with pain. Tr. 507.

At an appointment on October 25, 2006, Dr. Salotto observed that a straight leg raising test produced some pain in the right side more than the left; Keller had mild tenderness in the

lumbar spine; Keller had decreased pinprick sensation in the right lower leg and foot as compared to the left side; and she had decreased reflexes at the right ankle and knee. Tr. 405

Dr. Salotto examined Keller on February 6, 2007, and noted that Keller had muscle spasms and tenderness in the back and decreased range of motion. Tr. 403.

During 2002, Keller was  evaluated by Walter C. Peppelman, D.O., of the Pennsylvania Spine Institute, in conjunction with her claim for Workers' Compensation benefits. Tr. 427-434.  Dr. Peppelman concluded that Keller suffered from chronic low back pain and lumbar radiculopathy  but he would not recommend surgery. Tr. 429-430. Dr. Peppelman did not specify Keller's work-related functional abilities. Id. Dr. Peppelman also apparently again examined Keller on April 17, 2003, because on June 16, 2003 he wrote a letter to the Workers' Compensation Department mentioning that examination and further stated as follows: "The patient, when seen at the examination, had no evidence of any objective findings except for subjective complaints which were significant for signs of symptom magnification and inappropriate illness behavior. Review of multiple MRI's failed to reveal any extrinsic pathology and I was unable to identify any other significant pathology. . . . I do not feel this patient has any significant impairment to base her subjective complaints. . .   I feel this patient should be considered fully recovered from her lumbar strain and sprain, and

should be physically capable to perform her pre-injury job without restrictions." Tr. 657.  We did not discern in the administrative record the actual report of the April 17, 2003, evaluation.  Dr. Peppelman also examined Keller on December 8, 2005, but in his report of this examination did not specify Keller work-related functional capacity but merely indicated that "a functional capacity evaluation would be beneficial to identify what this patient's true capabilities are." Tr. 485.  Dr. Peppelman stated that Keller had "made a full recovery from her work related injury" and he did not feel that the disc replacement was related to her injury in April of 2001. Id.

On December 6, 2006, David C. Baker, M.D., examined Keller in conjunction with her Workers' Compensation claim. Tr. 522-527. Dr. Baker after interviewing Keller, performing a physical examination and reviewing her medical records concluded that she suffered from "[b]ack pain with persistent right anterior thigh pain and patella reflex diminution consistent with an L4 radiculopathy." Tr. 525.  With respect to functional abilities Dr. Baker stated that Keller could perform "sedentary to light duty where she is able to alternate like sit, stand, and walk and lifting [] limited to 15 to 20 pounds on a less than one hour a day total basis." Tr. 526.

On June 17, 2010, Dr. Salotto completed on behalf of Keller a document entitled "Lumbar Spine Medical Source Statement."

23

Tr. 649-652.  In the document Dr. Salotto stated that Keller had complaints of back pain, bilateral leg pain (right greater than left), chronic numbness in her right leg and foot, muscle cramps, and difficulty walking. Id.  Keller's pain was centered in her lower back. Id.  The pain was worse with sitting or standing for periods of time or bending or flexing her back.  Id.  Dr. Salotto reported positive objective findings of reduced range of motion in Keller's lumbar spine, as well as sensory loss, muscle spasm, and impaired sleep. Id.  He stated that she would only be able to walk one city block without resting; sit for thirty minutes at a time for a total of less than two hours in an 8-hour workday; and stand for thirty minutes at a time for a total of two hours in an 8-hour workday. Id.  If Keller were to work, she would need to be able to shift positions at will between sitting, standing, and/or walking; and she would require frequent unscheduled breaks of at least ten minutes each throughout the day. Id.  Keller would be restricted to occasionally lifting and/or carrying up to ten pounds. Id.  Dr. Salotto opined that Keller's pain or fatigue would interfere with her attention and concentration on a frequent basis and Keller's impairments would likely produce "good" days and "bad" days and that she would likely be absent from work more than four days a month as a result of her impairments. Id. In the final portion of the document Dr. Salotto stated that Keller's impairments have lasted at least twelve months and the symptoms and limitations

described in the document were extent as early as February, 2005.
Id.

The vocational expert who testified at the administrative hearing stated that if Dr. Salotto's limitations were accepted Keller could not perform any substantial gainful employment.

**DISCUSSION**

The administrative law judge at step one of the sequential evaluation process found that Keller had not engaged in substantial gainful work activity from her amended alleged onset date of February 1, 2005, through her date last insured of March 31, 2007. Tr. 12.

At step two of the sequential evaluation process, the administrative law judge found that Keller had the following severe impairments: "lumbar degenerative disc disease, status post surgery on March 1, 2005[.]" Id.  The administrative law judge did not address the issue of whether or not Keller suffered from a lower extremity radiculopathy. Id.

At step three of the sequential evaluation process the administrative law judge found that Keller's impairments did not individually or in combination meet or equal a listed impairment. Tr. 12-13.

At step four of the sequential evaluation process the administrative law judge found that Keller could not perform her past relevant work which as noted earlier was skilled, medium work

as a licensed practical nurse and unskilled, light to medium work as a warehouse worker but that she could perform a limited range of light work where Keller could "occasionally climb stairs, stoop, kneel and crouch or squat, but she [could] never climb ropes, ladders, scaffolding or poles or crawl.  She must avoid working in high exposed places, working around fast moving machinery on the ground, working around or with sharp objects or working around or with toxic or caustic chemicals." Tr. 13 and 16.  In her decision the administrative law judge did not provide Keller with the option to alternate between sitting and standing. <u>Id.</u>

In setting the residual functional capacity, the administrative law judge purportedly relied on the opinion of Dr. Peppelman who as noted earlier did not specify any work-related functional abilities and noted that a functional capacity evaluation would be beneficial to identify Keller's "true capabilities." Tr. 15 and 485.  The ALJ rejected the opinion of Dr. Baker that Keller was limited to "sedentary to light work with a sit/stand option and a lifting restriction of 15 to 20 pounds for up to one hour a day." Tr. 15.  Furthermore, the ALJ stated that Dr. Kramer "felt that [Keller] could go back to work." Tr. 14. However, our review of Dr. Kramer's only partially legible treatment notes did not reveal any such statement by him during the relevant time period of February 1, 2005 through March 31, 2007. Finally, the ALJ did not address the functional assessment

completed by Dr. Salotto on June 17, 2010, but merely referred to a treatment note of May 9, 2007, where Dr. Salotto indicated that Keller must avoid any type of repetitive bending, twisting or lifting and rejected that opinion "as not consistent with his own records and . . . not consistent with or supported by any imaging or other objective evidence." Tr. 15.

At step five, the administrative law judge based on the above residual functional capacity and the testimony of a vocational expert found that Keller had the ability to perform work as an injection molding machine tender and as a toll collector, and that there were a significant number of such jobs in the local, regional and national economies. Tr. 17.

Keller basically argues that the ALJ erred in her consideration of the treating physicians' medical records and assessment of Keller's functional abilities and that the residual functional capacity set by the ALJ in her decision is not supported by substantial evidence but the product of the ALJ's lay analysis of the medical records. We have thoroughly reviewed the record in this case which consists of 701 pages and find substantial merit in Keller's arguments.

Step two of the sequential evaluation process is the first point where the administrative law judge erred.  The administrative judge did not make a definitive determination as to whether or not Keller suffered from lower extremity radiculopathy.   The Social

Security regulations contemplate the administrative law judge considering whether there are any medically determinable impairments and then when setting a claimant's residual functional capacity considering the symptoms of both medically determinable severe and non-severe impairments. 20 C.F.R. § 404.1529. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limit the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). A failure to find a medical condition severe at step two will not render a decision defective if some other medical condition was found severe at step two. However, all of the medically determinable impairments both severe and non-severe must be considered at step two and then at step four when setting the residual functional capacity. The social security regulations mandate such consideration and this court has repeatedly so indicated. See, e.g., Christenson v. Astrue, Civil No. 10-1192, slip op. at 12 (M.D. Pa. May 18, 2011)(Muir, J.); Little v. Astrue, Civil No. 10-1626, slip op. at 19-21 (M.D.Pa. September 14, 2011)(Kosik, J.); Crayton v. Astrue, Civil No. 10-1265, slip op. at 32-35 (M.D.Pa. September 27,

2011)(Caputo, J.); <u>Shannon v. Astrue</u>, Civil No. 11-289, slip op.
at 39-41 (M.D.Pa. April 11, 2012)(Rambo, J.); <u>Bell v. Colvin</u>, Civil
No. 12-634, slip op. at 23-24 (M.D.Pa. Dec. 23, 2013)(Nealon, J.);
20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

    The failure of the administrative law judge to find the
above referenced condition - radiculopathy - as a medically
determinable impairment, or to give an adequate explanation for
discounting it, makes the administrative law judge's decisions at
steps two and four of the sequential evaluation process defective.
The error at step two of the sequential evaluation process draws
into question the ALJ's RFC assessment and the assessment of
Keller's credibility.  The administrative law judge found that
Keller's medically determinable impairments could reasonably cause
Keller's alleged symptoms but that Keller's statements concerning
the intensity, persistence and limiting effects of those symptoms
were not credible.  This determination by the administrative law
judge was based on an incomplete and faulty analysis of all of
Keller's medically determinable impairments.

    The administrative law judge rejected the opinion of a
treating physician regarding the physical functional abilities of
Keller.  The preference for the treating physician's opinion has
been recognized by the Court of Appeals for the Third Circuit and
by all of the federal circuits. <u>See</u>, <u>e.g.</u>, <u>Morales v. Apfel</u>, 225
F.3d 310, 316-18 (3d Cir. 2000).  When the treating physician's

opinion conflicts with a non-treating, non-examining physician's opinion, the administrative law judge may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Id.  In choosing to reject the evaluation of a treating physician, an administrative law judge may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence. Id.  An administrative law judge may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion. Id.  An administrative law judge may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." Id.  As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong."  Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

In this case the ALJ did not address Dr. Salotto's functional assessment and did not point to an assessment by a treating or examining physician specifying Keller's work-related functional abilities, such as sitting, standing, walking, lifting, and carrying, but engaged in her own lay analysis of the bare

medical records. There is a lack of substantial evidence supporting the administrative law judge's residual functional capacity assessment and the ALJ erred by failing to address Dr. Salotto's functional assessment.

We recognize that the residual functional capacity assessment must be based on a consideration of all the evidence in the record, including the testimony of the claimant regarding her activities of daily living, medical records, lay evidence and evidence of pain. See Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112, 121-122 (3d Cir 2000). However, rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant. See Doak v. Heckler, 790 F.2d 26, 29 (3d Cir.1986)("No physician suggested that the activity Doak could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence."); 20 C.F.R. § 404.1545(a). As two commentators have explained:

> Sometimes administrative law judges assert that they –
> and not physicians - have the right to make residual
> functional capacity determinations. In fact, it can
> reasonably be asserted that the ALJ has the right
> to determine whether a claimant can engage in
> sedentary, light, medium, or heavy work.  The ALJ
> should not assume that physicians know the Social
> Security Administration's definitions of those
> terms. Even though the RFC assessment draws from
> medical sources for support, it is ultimately an
> administrative determination based on those
> administrative definitions and is reserved to the

Commissioner.  <u>However, the underlying determination</u>
<u>is a medical determination, i.e., that the claimant can</u>
<u>lift five, 20, 50, or 100 pounds, and can stand for</u>
<u>30 minutes, two hours, six hours, or eight hours.</u>
<u>That determination must be made by a doctor.  Once</u>
<u>the doctor has determined how long the claimant can</u>
<u>sit, stand or walk, and how much weight the claimant</u>
<u>can lift and carry, then the ALJ, with the aid of a</u>
<u>vocational expert if necessary, can translate that</u>
<u>medical determination into a residual functional</u>
<u>capacity determination.</u>  Of course, in such a situation
a residual functional capacity determination is merely
a mechanical determination, because the regulations
clearly and explicitly define the various types of
work that can be performed by claimants, based upon
their physical capacities. Thus, while agency regulations
provide the ultimate issues such as disability and RFC
are reserved to the agency, it may not reject a
physician's medical findings that determine the various
components and requirements of RFC.

Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability
Law and Procedure in Federal Courts, 344-345 (2014)(emphasis
added); <u>see also</u> <u>Woodford v. Apfel</u>, 93 F.Supp.2d 521, 529 (S.D.N.Y.
2000)("An ALJ commits legal error when he makes a residual
functional capacity determination based on medical reports that do
not specifically explain the scope of claimant's work-related
capabilities."); <u>Zorilla v. Chater</u>, 915 F.Supp. 662, 667 (S.D.N.Y.
1996)("The lay evaluation of an ALJ is not sufficient evidence of
the claimant's work capacity; an explanation of the claimant's
functional capacity from a doctor is required."). The
administrative law judge cannot speculate as to a claimant's
residual functional capacity but must have medical evidence, and
generally a medical opinion regarding the functional capabilities
of the claimant, supporting his determination. <u>Id.</u>

In this case there was no assessment of the functional capabilities of Keller from a physician which supported the administrative law judge's residual functional capacity assessment and the bare medical records and other non-medical evidence were insufficient for the administrative law judge to conclude that Keller had the residual functional capacity to engage in a limited range of light work.[19]

Our review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) vacate the decision of the Commissioner and remand the case to the Commissioner for further proceedings.

An appropriate order will be entered.

---

[19]The administrative record did contain an RFC assessment from a non-medical state agency adjudicator. Tr. 623-629.  This court has repeatedly stated that reliance on such a statement is inappropriate and the ALJ in this case did not rely on that statement. See, e.g., Ulrich v. Astrue, Civil No. 09-803, slip op. at 17-18 (M.D.Pa. December 9, 2009)(Muir, J.); Spancake v. Astrue, Civil No. 10-662, slip op. at 15 (M.D. Pa. December 23, 2010)(Muir, J.); Gonzalez v. Astrue, Civil No. 10-839, slip op. at 16 (M.D.Pa. January 11, 2011)(Muir, J.);  Peak v. Astrue, Civil No. 10-889, slip op. at 25 (M.D.Pa. January 24, 2011)(Muir, J.); see also Dutton v. Astrue, Civil No. 10-2594, slip op. at 22 n. 32(M.D.Pa. January 31, 2012)(Munley, J.); Demace v. Astrue, Civil No. 11-1960, slip op. at 36-37(M.D.Pa. April 25, 2013)(Munley, J.).